UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| [UNDER SEAL],<br><br>            Plaintiffs,<br><br>     v.<br><br>[UNDER SEAL],<br><br>            Defendants. | Civil No. 14-__-P-__<br><br>COMPLAINT<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

**DOCUMENT TO BE KEPT UNDER SEAL**

James B. Haddow
jhaddow@pmhlegal.com
PETRUCCELLI, MARTIN & HADDOW LLP
Two Monument Square, Suite 900
Post Office Box 17555
Portland, Maine 04112-8555
Tel: 207.775.0200 x 1013

Timothy P. McCormack
tmccormack@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20002
Tel: (202) 833-4567

Attorneys for [UNDER SEAL]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. BRIAN EMERY,<br><br>                    Plaintiffs,<br><br>   vs.<br><br>ROOF SYSTEMS OF MAINE, INC., KEVIN GRIFFIN, and JCN CONSTRUCTION CO., INC.,<br><br>                    Defendants. | Civil No. 14-__-P-__<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729 et seq.]<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**JURY TRIAL DEMANDED** |

*Qui Tam* Plaintiff-Relator Brian Emery, through his attorneys, on behalf of the United States of America (the "Government," or the "Federal Government"), for his Complaint against Defendants Roof Systems of Maine, Inc. ("Roof Systems"), Kevin Griffin ("Griffin"), and JCN Construction Co., Inc. ("JCN") (collectively "Defendants") alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.   INTRODUCTION

1.   This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendants and/or their agents and employees in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*.

2.   This *qui tam* case is brought against Defendants for knowingly defrauding the federal Government in connection with roofing and siding contracts for three federal building projects in Maine. As alleged below, defendants used substandard materials and otherwise

1

installed roofing, siding and other materials on federal buildings in violation of the relevant contract requirements and industry standards.

3. Through this scheme, Defendants have defrauded the United States of hundreds of thousands, if not millions, of dollars.

4. Defendants' conduct alleged herein violates the federal False Claims Act (the "FCA"), which was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

5. The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) conspiring to knowingly present or cause to be presented to the federal government a false or fraudulent claim for payment or approval; and (d) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. 31 U.S.C. §§3729(a)(1)(A)-(C), and (G). Any person

who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1).

6. For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that the defendants specifically intended to commit fraud. *Id*. Unless otherwise indicated, whenever the words "know," "learn," "discover," or similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

7. The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

8. Based on the foregoing laws, *Qui Tam* Plaintiff-Relator Brian Emery seeks, through this action, to recover damages and civil penalties arising from the false or fraudulent records, statements, and/or claims that the Defendants made or caused to be made in connection with false and/or fraudulent claims for payment for work on federally-funded construction jobs.

## II. PARTIES

9. Relator Brian Emery ("Emery") is a private person who resides in Madison, Maine. Relator has worked in the roofing and siding industry for forty years as, at various times, a contractor, a sub-contractor and an individual craftsman. He worked as a subcontractor for

Roof Systems of Maine, Inc. for five years. At times during this period, approximately 80% of his work was for Roof Systems of Maine, Inc.

10. Defendant Roof Systems of Maine, Inc. ("Roof Systems") is a Maine corporation with a principal place of business in Bangor, Maine. Roof Systems provides commercial and industrial roofing services in Maine and New Hampshire.

11. Defendant Kevin Griffin ("Griffin") lives in Bangor, Maine. He is the President and primary owner of Roof Systems. Griffin has very close relationships with Jeremiah "JD" Emerson, the Roof Systems project manager on all three projects at issue. Griffin trained Emerson in the roofing and siding business, and in Relator's experience, whenever Mr. Emerson ran into problems on a job, he consulted directly with Mr. Griffin

12. With respect to the job at the Brunswick National Guard base, described below, Relator raised his concerns about Roof Systems' use of inferior products and installation directly with Mr. Griffin both on the phone and in person. Mr. Griffin dismissed Relator's concerns saying, more or less, 'we've got to do what we've got to do to get the job done.'

13. With respect to the job at the Portsmouth Naval Shipyard, during the course of the work on Building #86, Mr. Griffin sent his right-hand man at Roof Systems, Lee Corro, to oversee the job because it was taking longer than planned. During this period, Mr. Corro worked on site Monday through Wednesday of each week. To the extent that Mr. Corro learned about issues with the job, such as the problems outlined in greater detail below, Relator believes he would have related that information to Mr. Griffin and sought his approval for such a blatant violation of the contract requirements.

14. During the time when Relator worked as a sub-contractor for Roof Systems, he developed extensive knowledge of the business practices of Griffin, Corro and Emerson. In

Relator's experience, the type of improper substitution of inferior materials and use of inferior construction practices at issue in this Complaint are characteristic of Griffin's business practices.

15. Accordingly, Relator is informed and believes, and on that basis alleges, that Griffin knew of and personally ordered and/or approved of all of the fraudulent conduct of Roof Systems alleged herein.

16. Hereafter, unless otherwise set forth, the term "Roof Systems" means both Roof Systems of Maine, Inc. and Griffin.

17. Defendant JCN Construction Co., Inc. ("JCN") is a New Hampshire corporation, with a principal place of business in Manchester, New Hampshire. JCN is a building contractor and manager specializing in governmental, educational, multi-housing, commercial, industrial and medical facilities.

### III. JURISDICTION AND VENUE

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

19. Under 31 U.S.C. § 3730(e) there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Even if there had been any such public disclosure, Relator is the original source of the allegations herein because he has direct, independent, and material knowledge of the information that forms the basis of this Complaint, and voluntarily disclosed that information to the Government before filing.

20. This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. §3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the District of Maine.

21. Venue is proper, pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, and/or transact business in the District of Maine, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district.

## IV. ALLEGATIONS

### A. Cutler Naval Radio Station

22. Sometime in 2012 or 2013, LaRosa Building Group ("LaRosa"), a Connecticut corporation, entered into a contract with the United States to repair the 1950s-era power plant located at the Cutler Naval Radio Station in Cutler, Maine (the "Cutler Power Plant").

23. In or around February 2013 defendant Roof Systems became a sub-contractor on the Cutler Power Plant job, working under the acting general contractor, LaRosa.

24. In or around February 2013, Emery, as owner of Roof Solutions, LLC, entered into an oral contract with defendant Roof Systems as a sub sub-contractor to, *inter alia*, install approximately 325 squares of metal siding (32,500 square feet), and the related trim and flashing on the Cutler Power Plant.

25. Relator was hired only to provide specialized labor. Roof Systems provided all of the materials that Relator installed. Relator had no responsibility for acquiring the siding, trim or flashing for this job.

26. Relator learned during a conversation with Dave Hamilton, the site supervisor for LaRosa, and otherwise during the course of his work on the job, that the contract called for, among other things, all trim and flashings: (a) to be supplied by Kingspan: (b) to have 22-guage steel metal skin; and, most important, (c) to have a factory-applied corrosion resistant coating.

6

27. The corrosion resistant coating was required because the Cutler Power Plant was within close proximity to salt water (the ocean). Without the corrosion resistant coating, the salt water will cause the metal to corrode excessively.

28. Notwithstanding the requirements of the contract and the warranty, and although Roof Systems used the proper material for the siding itself, Roof Systems used inferior, substitute metal for the trim and flashing.

29. Roof Systems was supposed to obtain from Kingspan flat sheets from which to fabricate onsite all of the trim and flashings. An initial shipment of flat sheets provided only enough material to fabricate roughly ten percent of the total amount of trim and flashings needed for the job.

30. At the direction of Roof Systems project manager JD Emerson, roughly ninety percent of the total amount of trim and flashings were fabricated from flat sheets from Drexel Metals. These substituted flat sheets were no thicker than 24-guage, which is lighter than 22-guage, and had no corrosion resistant coating. The inferior trim and flashing material cost about one third as much as the material the contract required.

31. The substituted material used for the trim and flashings has no warranty within a one-half mile exclusion zone from salt water. Any warranty issued by Kingspan for the siding is void due to the material substitutions of the non-Kingspan metal for the trim and flashing.

32. The substituted trim and flashing material will rust relatively quickly, destroying the integrity and appearance of the entire siding installation. Eventually the inferior materials will cause rust streaks down the siding panels and will hasten the rusting of the siding panel surfaces as well.

33. Roof Systems also violated the contract specifications by using materials from multiple manufacturers, rather than from a sole source.

34. Roof Systems also used uncertified welders to attach ladders to the side of the building after installing the siding.

35. Relator finished work on the Cutler Power Plant in July, 2014. Based on Relator's substantial experience in the roofing and siding industry, Relator believes, and on that basis alleges, that Roof Systems submitted invoices and/or other documentation to LaRosa shortly thereafter, with the expectation that LaRosa would use those invoices and/or other documentation to get paid by the United States for Roof Systems' work on the Cutler Power Station.

36. If Roof Systems had disclosed to the United States, through its invoices and other submissions to LaRosa, that it used inferior material for the trim and flashing, the United States would not have paid LaRosa for the siding work Roof Systems did on the Cutler Power Plant. Accordingly, Relator also alleges, on information and belief, that Roof Systems falsely represented, either explicitly or implicitly, in those invoices and/or other documentation that it had used the trim and flashing materials required by the contract.

37. To repair the damage caused by Roof Systems' fraudulent conduct, and comply with the Federal Government's contract specifications, the inferior trim and flashings must be replaced with trim and flashings fabricated from Kingspan flat sheets. This process will require removal of the siding, flashings, trim, fascia, gutter, downspouts, and ladders, followed by the reapplication of the aforementioned materials. The welding attaching the ladders to the side of the building will also have to be replaced by a certified welder.

### B.     Portsmouth Naval Shipyard

38.     Sometime in 2009 or 2010, Kallidus Technologies, Inc. ("Kallidus"), a California corporation, entered into a contract with the United States to repair Building #86 at the Portsmouth Naval Shipyard located in Kittery, Maine.

39.     In approximately 2009 or 2010 defendant Roof Systems became a sub-contractor on the Building #86 job, working under the acting general contractor, Kallidus.

40.     In 2010, Roof Systems hired Emery's Roof Solutions, LLC on an hourly basis as a sub sub-contractor to assist with the work on Building #86.  Specifically, Relator was hired to help repair and reattach the 150-year old copper cornices of Building #86 and install related copper bands.  A cornice is a horizontal decorative molding that crowns a building.  Relator had no responsibility for or authority regarding the acquisition of materials for the job.

41.     The contract called for, among other things, all cornice pieces to be copper and attached by brass bolts installed through the cornice and through the existing steel framework.

42.     Contrary to the contract requirements, Roof Systems used self-tapping, steel, TEK-5 screws rather than the specified brass bolts.  By doing this, Roof Systems saved money on both the materials and the installation labor time.  TEK-5 screws are less expensive than brass bolts.  More significantly, though, the TEK-5 screws can be installed relatively easily using a cordless impact drill.  The brass bolts, on the other hand, require that the cornice pieces be temporarily held in place while holes are drilled through both the copper and existing steel structure.

43.     The use of steel screws rather than brass bolts is a significant structural and safety problem.  First, steel is a weaker metal than brass.  Second, fundamental principles of construction and metal working provide that dissimilar materials (such as steel and copper) must

9

be separated by a barrier to prevent oxidation. Roof Systems failed to install any such barrier between the copper of the cornices and the steel screws. Because no barrier layer was used, galvanic action will likely rust through the steel TEK-5 screws, leaving little or nothing to secure the cornice pieces to the building

44. To meet the Federal Government's contract specifications all TEK-5 screws need to be replaced with the called-for brass bolts. This involves removing the copper shelf, ice and water shield, plywood, and in some places the dentals to allow access to the existing steel structure. Then the TEK-5 screws must be removed and replaced with the brass bolts. Once the brass bolts are installed the plywood will have to be replaced, and a new high temperature ice and water shield and a new copper shelf will have to be installed. The existing copper shelf is soldered and thus not reusable. A new copper shelf will have to be soldered.

45. Similarly, Tap-con steel screws were used to attach one or more of the copper bands installed at the same time as the cornices. These screws were also used without the use of a barrier separating the steel from the copper, contrary to the contract specifications and industry standards. To remedy this, all of the copper bands must be replaced, and installed with the proper fasteners.

46. JD Emerson was the project manager for the Building #86 project, and ordered that the inferior products be used.

47. Relator completed his work on the Building #86 project on or around February 18, 2011. Relator knows that Roof Systems submitted bills for the work on Building #86 to Kallidus because it took Kallidus over a year after the job was completed to pay Roof Systems, and Roof Systems withheld a substantial portion of the amount it owed Relator until it was

finally paid by Kallidus. During the process of resolving that dispute, Relator learned that Kallidus had billed the United States and been paid for the work done by Roof Systems.

48.     If Roof Systems had disclosed to the United States, through its invoices and other submissions to Kallidus, that it used steel screws rather than brass bolts, the United States would not have paid Kallidus for the cornice and other copper work Roof Systems did on Building #86. Accordingly, Relator also alleges, on information and belief, that Roof Systems falsely represented, either explicitly or implicitly, in those invoices and/or other documentation that it had complied with the contractual requirements.

### C.     Brunswick Army National Guard

49.     Sometime in 2012 or 2013 defendant JCN entered into a contract with the United States to build the Armed Forces Readiness Center (the "AFRC") on the Brunswick Army National Guard base located in Brunswick, Maine.

50.     Sometime in 2012 or 2013 defendant Roof Systems became a sub-contractor on the Brunswick Army National Guard job, working under the acting general contractor, JCN.

51.     On or about March 13, 2013, Roof Systems hired Emery, as owner of Roof Solutions, LLC, as a sub sub-contractor on the AFRC job. Relator was hired to provide specialized labor in connection with the installation of siding on the AFRC. Relator had no responsibility for or authority regarding the acquisition of materials for the job.

52.     The contract called for, among other things: (a) the use of insulated metal panel siding manufactured by Kingspan; and (b) the use of environmentally-friendly Low Volatile Organic Compound ("LVOC") adhesive on the roof. Relator saw the "submittals" sent to the architect (and thus incorporated into the building design) regarding the contractual requirements

for the paneling work. He learned about the requirement that LVOC adhesive be used on the roof from Roof Systems project manager JD Emerson.

53. The contract called for the use of insulated metal panels manufactured by Kingspan. Although Roof Systems ordered the proper type of panel, many of the panels were unusable because Roof Systems ordered the wrong size panels.

54. Rather than reorder the correct size panels, Roof Systems fabricated substitute panels onsite from inferior materials that are not from Kingspan. The Kingspan panels are shop fabricated under controlled conditions with an inner metal face and an outer metal face, whereas the substitute panels Roof Systems made have only an outer metal face. The Roof Systems panels are also several shades different in color than the Kingspan panels. In addition, the substitute panels are susceptible to "oil canning" (*i.e.*, suffering buckling or other deformation) because the adhesion of the panel face is incomplete. The substitute panels also lack horizontal gaskets to seal out water.

55. Roof Systems installed these inferior panels by screwing them directly into the exterior of the AFRC building.

56. Moreover, pursuant to the installation instructions from Kingspan, all metal panels must be sealed with caulking on all four edges to the underlying subgirts. In spite of these instructions, JD Emerson specifically instructed Relator's employees working at the site not to perform the caulking, either for the few Kingspan panels actually used or for the substitute Roof Systems-made panels.

57. Roof Systems also violated the contract specifications by using materials from multiple manufacturers, rather than from a sole source.

58. Roof Systems has also deliberately violated the contract requirements by using High Volatile Organic Compound ("HVOC") adhesive on the roof, rather than the LVOC required by the contract. JD Emerson told Relator that installing the roof using the LVOC adhesive was taking too long, so Roof Systems surreptitiously substituted HVOC adhesive. Roof Systems did this by bringing empty LVOC containers back to the Roof Systems office in Bangor at night, and filling them with HVOC adhesive. Roof Systems then brought the mislabeled adhesive containers onto the job site the next day and used the HVOC adhesive on the roof.

59. Defendant JCN is aware of, and has helped Roof Systems attempt to hide the improper substitution of the inferior materials. Relator shared his concerns about Roof Systems' performance on the AFRC with an army contracting representative responsible for the AFRC job. The army contracting representative shared Relator's concerns with JCN, who then further shared them with Roof Systems. Roof Systems then threatened to sue Relator for defamation for reporting their fraud to the Government and/or JCN.

60. Although the AFRC job is ongoing, Relator believes, based on his years of work in the industry and prior experience with Roof Systems, that Roof Systems and JCN have submitted invoices and/or other documentation to the United States to get at least partial payment for the work performed by Roof Systems on the AFRC job.

61. If Roof Systems or JCN had disclosed to the United States, through its invoices and other submissions related to the work by Roof Systems, that it used inferior panels and installed them incorrectly or that it used HVOC adhesive on the roof, the United States would not have paid JCN for the work Roof Systems did on the AFRC job. Accordingly, Relator also alleges, on information and belief, that Roof Systems and JCN falsely represented, either

explicitly or implicitly, in those invoices and/or other documentation that they had complied with the contractual requirements for this work.

62. To repair the damage caused by Roof Systems and JCN's fraudulent conduct, and to comply with the Federal Government's contract specifications, all substitute panels must be removed and replaced with Kingspan panels, which in many areas requires removal of nearly all of the panels to gain access to the substitute materials that are low on the walls. In addition, replacement of the substandard panels will require the removal of soffit, fascia, and roof edge metal. To remove roof edge metal requires cutting into the roof system. Similar steps will be required to correct the failure to caulk the panels.

63. To correct the improper use of HVOC adhesive, the roof work will have to be redone as well.

## COUNT I

### Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)–(C), (G)

64. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 63 of this Complaint.

65. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

66. By virtue of the acts described above, Defendants, their agents, and employees, knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

67. By virtue of the acts described above, Defendants, their agents, and employees, knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

68. By virtue of the acts described above, Defendants conspired to submit false claims, cause false claims to be submitted, and make and/or use false or fraudulent records material to false claims.

69. By virtue of the acts described above, Defendants, their agents, and employees, knowingly concealed overpayments from the United States Government and failed to remit such overpayments.

70. The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

71. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

72. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## PRAYER

WHEREFORE, *Qui Tam* Plaintiff-Relator Brian Emery prays for judgment against Defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq*.

2. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4. That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That the United States and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED: November 17, 2014            Respectfully submitted,

  /s/ James B. Haddow

James B. Haddow, Esquire
jhaddow@pmhlegal.com
PETRUCCELLI, MARTIN & HADDOW LLP
Two Monument Square, Suite 900
Post Office Box 17555
Portland, Maine 04112-8555
Tel: 207.775.0200 x 1013

Timothy P. McCormack, Esquire
tmccormack@phillipsandcohen.com
PHILLIPS & COHEN LLP
2000 Massachusetts Ave, NW
Washington, DC 20002
Tel: (202) 833-4567

Attorneys For *Qui Tam* Plaintiff-Relator Brian Emery